# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2592

MICHAEL NAHAS, Individually and as Administrator of the Estate of Faye McCoy, Decedent, and on behalf of the Estates sole beneficiary, DPS Jr., Ms. McCoys minor child,

*Appellant,*

– v. –

CITY OF PITTSBURGH, A Municipal Corporation; OFFICER ZACARIAH NORMAN, Individually and in his official capacity; OFFICER EMILY SHIELDS, individually and in her official capacity; OFFICER MICHAEL SOKOLOWSKI, Individually and in his official capacity; ARTHUR JEFFREY INC, a/k/a Art's Tavern; JANE DOE; JOHN DOE,

*Appellees.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA IN NO. 2:24-CV-01252, HONORABLE CHRISTY CRISWELL WIEGAND, U.S. DISTRICT JUDGE

## BRIEF FOR *AMICUS CURIAE* PROFESSOR DARRELL A.H. MILLER IN SUPPORT OF APPELLANT

DARRELL A. H. MILLER (PRO HAC VICE)
UNIVERSITY OF CHICAGO LAW SCHOOL*
*Attorney for Amicus Curiae*
1111 East 60th Street
Chicago, Illinois 60637
(773) 702-9494

*Institutional affiliation for identification purposes only

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (625419)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

STATEMENT OF IDENTITY AND INTEREST .......... 1

ARGUMENT .......... 2

I. The Standard for Unenumerated Rights Under the Due Process Clause .......... 2

II. The Third Circuit's State-Created Danger Doctrine .......... 5

III. The Third Circuit's State-Created Danger Doctrine is Consistent With This Nation's History and Tradition of Tort Liability for the Malfeasance or Misfeasance of Government Officials .......... 7

A. Tort Liability for Officer Malfeasance and Misfeasance from the Founding Until the Reconstruction Era .......... 8

B. Tort Liability for Officer Malfeasance and Misfeasance from Reconstruction Onward .......... 13

C. The History and Tradition of Due Process Supports a Narrow Cause of Action for State-Created Dangers .......... 20

CONCLUSION .......... 21

## TABLE OF AUTHORITIES

**Cases**

*Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014). ........................................................4

*Buck v. Colbath*, 70 U.S. (3 Wall.) 334 (1865)........................................................10

*Dep't of State v. Munoz*, 602 U.S. 899 (2024)..........................................................3

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189 (1989)........ 5, 20

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). ........................... 2-3

*Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204 (3d Cir. 2001)...................... 20-21

*Eknes-Tucker v. Gov. of Ala.*, 114 F.4th 1241 (11th Cir. 2024). ...............................3

*Elliott v. Swartwout*, 35 U.S. (10 Pet.) 137 (1836). ........................................ 10, 12

*Erwin v. Davenport*, 56 Tenn. (9 Heisk.) 44 (1871). ...............................................19

*Galloway v. United States*, 319 U.S. 372 (1943). ......................................................8

*Johnson v. City of Philadelphia*, 975 F.3d 394 (3d Cir. 2020). ................................6

*Kedra v. Schroeter*, 876 F.3d 424 (3d Cir. 2017). ................................................3, 6

*Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996)........................................ 1, 2, 5, 20

*Ladd v. Newell*, 24 N.W. 366 (Minn. 1885). ..........................................................20

*Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804). ............................................ 10, 12

*Loving v. Virginia*, 388 U.S. 1 (1967). ................................................................4, 7

*Mirabelli v. Bonta*, 607 U.S. 492 (2026) (per curiam). ............................................3

*Mitchell v. Harmony*, 54 U.S. (13 How.) 115 (1852) ...................................... 10, 12

*Paul v. Slason*, 22 Vt. 231 (1850). ..........................................................................20

*Sauers v. Borough of Nesquehoning*, 905 F.3d 711 (3d Cir. 2018).........................20

*Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109 (2024). ..........................................7

*Storrs v. Wetmore*, 1 Kirby 203 (Conn. Super. Ct. 1787).....................................19

*Tanzin v. Tanvir*, 592 U.S. 43 (2020). ............................................................ 10, 12

*Troxel v. Granville*, 530 U.S. 57 (2000). ...................................................................4

*Washington v. Glucksberg*, 521 U.S. 702 (1997). .....................................................3

*Wise v. Withers*, 7 U.S. (3 Cranch) 331 (1806) .....................................................12

*Wright v. Shanahan*, 44 N.E. 74 (N.Y. 1896)..........................................................19

**Statutes**

42 U.S.C. § 1983 .............................................................................................................8

42 U.S.C. § 1985 .............................................................................................................8

42 U.S.C. § 1986 ...................................................................................................... 8, 18

Civil Rights Act of 1871, ch. 22, § 6, 17 Stat. 15 (codified as amended at 42 U.S.C. § 1986). .........................................................................................18

First Statute of Westminster 1275, 3 Edw. 1 c. 24 (Eng.). .......................................9

**Other Authorities**

1 William Blackstone, Commentaries (1793)..........................................................9

Circular Letter, signed by A.J. Hamilton, M.J. Saffold & Wm. B. Stokes, Trib. Tracts No. 2, July 10, 1866. ..............................................................................14

Cong. Globe, 39th Cong., 1st Sess. (1866). ............................................. 15, 16, 18

Cong. Globe, 42d Cong., 1st Sess. (1871). .............................................................17

Dan B. Dobbs, The Law of Torts (2000). ......................................................... 7, 19

David E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1 (1972)........................................................... 9, 10

David H. Gans, *Forgotten Framers: Black Conventions and the Second Founding*, 79 Stan. L. Rev. ____ (forthcoming 2027), https://ssrn.com/abstract=6292939. .................................................................15

George C. Rable, But There Was No Peace: The Role of Violence in the Politics of Reconstruction (2007)..........13

James E. Pfander & Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 N.Y.U. L. Rev. 1862 (2010). .......... 7, 10

James Pfander, Constitutional Torts and the War on Terror (2017). ..........13

Joseph Story, Commentaries on the Law of Agency (6th ed. 1863). ..........11

Joseph Story, Commentaries on the Law of Agency (1st ed. 1839). ..........11

Kurt T. Lash, *The Origins of the Privileges or Immunities Clause, Part III: Andrew Johnson and the Constitutional Referendum of 1866*, 101 Geo. L.J. 1275 (2013). .......... 13, 14

Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1 (1963). .......... 9, 10

Pamela Brandwein, Rethinking the Judicial Settlement of Reconstruction (2011). ..........18

Report on Memphis Riots and Massacres, H.R. Rep. No. 39-101 (1st Sess. 1866) .......... 14, 16

*Secretary Browning's Letter*, Evening Post, Oct. 24, 1866 (N.Y.C.)..........15

*The Southern Loyalists' Convention*, Trib. Tracts No. 2, July 10, 1866. ..........14

Thomas M. Cooley, A Treatise on Constitutional Limitations (1st ed. 1868) (reprint 1972). ..........16

Thomas M. Cooley, A Treatise on Constitutional Limitations (4th ed. 1878)..........16

Timothy M. Tymkovich, Joshua Dos Santos & Joshua J. Craddock, *A Workable Substantive Due Process*, 95 Notre Dame L. Rev. 1961 (2020). .......... 3, 4, 12

## STATEMENT OF IDENTITY AND INTEREST

Professor Darrell A. H. Miller has been appointed to brief this Court as *amicus curiae* to address the question: "whether there is liberty interest, deeply rooted in history and tradition, in being free from 'state-created danger' as discussed in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), and its progeny."

Miller is the Harry N. Wyatt Professor of Law at the University of Chicago Law School with nineteen years of experience in the legal academy. He is a scholar of constitutional law, civil rights, and legal history and has taught civil rights litigation, civil procedure, state and local government law and a seminar on the Reconstruction Amendments. His scholarship has been published in leading law journals including the *Yale Law Journal*, the *Columbia Law Review*, the *University of Chicago Law Review*, and the *New York University Law Review*, and has been cited by numerous courts including the Supreme Court of the United States.

No party's counsel authored this brief in whole or in part. No party nor any party's counsel contributed money that was intended to fund preparing or submitting the brief. The University of Chicago Law School supports faculty research, scholarship, and professional activities which helped offset any personal cost to *amicus curiae*. The University of Chicago Law School is not a signatory to this brief and Professor Miller files this brief solely in his individual capacity.

Otherwise, no person other than *amicus curiae* contributed money intended to fund the preparation or submission of this brief.

## ARGUMENT

This nation's deeply rooted history and tradition, stretching from the Founding to the Reconstruction Era to the present, has been to hold government officials personally liable for injuries they cause due to outrageous or conscience-shocking malfeasance or misfeasance in office. Specifically, this nation's tort system has traditionally imposed liability on government officials in the narrow circumstance where the direct and foreseeable consequence of intentional misconduct or gross misuse of official authority renders a particular person, or discrete class of persons, more vulnerable to injury. Consequently, this Court's "state-created danger" doctrine as discussed in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), and its progeny is consistent with the unenumerated rights jurisprudence of the United States Supreme Court.

### I. The Standard for Unenumerated Rights Under the Due Process Clause

The Due Process Clauses of the Fifth and Fourteenth Amendments recognize unenumerated rights, but only those "'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs v.*

*Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

A party claiming an unenumerated fundamental right must "careful[ly] descri[be]" that interest, *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024) (alterations added) (quoting *Glucksberg*, 521 U.S. at 721), and must not describe the unenumerated right at "too high a level of generality," *Kedra v. Schroeter*, 876 F.3d 424, 449 (3d Cir. 2017). Further, judges must be cautious in construing the Supreme Court's "inconsisten[t]," "'contradictory,'" and "'imprecise'" unenumerated rights precedent. *Eknes-Tucker v. Gov. of Ala.*, 114 F.4th 1241, 1246 (11th Cir. 2024) (Pryor, C.J., respecting the denial of rehearing en banc) (alterations added) (quoting Timothy M. Tymkovich, Joshua Dos Santos & Joshua J. Craddock, *A Workable Substantive Due Process*, 95 Notre Dame L. Rev. 1961, 1963 (2020)).

A careful description of the interest at an appropriate level of generality does not require a historical twin, however. In an interim application case, *Mirabelli v. Bonta*, 607 U.S. 492 (2026) (per curiam), the Court considered California public school policies that prevented school officials from telling parents about their child's gender transition efforts without the child's consent. *Id.* at 492-93. The Court stated that the policies likely violated the parents' substantive due process rights "to direct the upbringing and education of their children." *Id.* at 497; *see*

*also Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality) (identifying the fundamental right in a child visitation case as "the interest of parents in the care, custody, and control of their children"). Similarly, in *Loving v. Virginia*, 388 U.S. 1 (1967), the Court held that a prohibition on interracial marriage violated due process because the right to *marriage* "has long been recognized as . . . essential to the orderly pursuit of happiness by free men," *id.* at 12, not because the right to *interracial marriage* is deeply rooted in this nation's history and tradition. Indeed, the history and tradition of marriage at that specific level of generality proved quite the contrary. *See Baskin v. Bogan,* 766 F.3d 648, 666 (7th Cir. 2014) ("Laws forbidding black-white marriage" date back "to colonial times").

Instead of a historical twin, a plaintiff should need to plead and prove only that the government action departs from a carefully described "settled tradition or norm . . . that is longstanding, deliberately chosen or deliberately kept, and widely acknowledged by relevant actors such as founding figures, legislatures, or influential commentators." *See* Tymkovich et al., *supra*, at 2008. A narrowly drawn "state-created danger" doctrine that provides a remedy for outrageous or conscience-shocking malfeasance or misfeasance under color of law fits comfortably within such a longstanding tradition.

## II. The Third Circuit's State-Created Danger Doctrine

In *Kneipp*, this Court joined several of its sister circuits in finding that a party may state a claim for a "state-created danger" violation of the Due Process Clause. 95 F.3d at 1205. *Kneipp* arose from a case where officers of the Philadelphia Police Department separated a severely intoxicated woman from her spouse and left her to fend for herself in the middle of the night in near-freezing weather. *Id.* at 1201–02. Two hours later, she was found at the bottom of an embankment, suffering from hypothermia. *Id.* at 1203. The resulting anoxia left her with permanent debilitating brain damage. *Id.*

While this Court acknowledged in *Kneipp* that there is no due process violation for the government's simple failure to protect, *see id.* at 1204–05; *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 196, 200 (1989), it recognized a narrow ground for liability where a government official is aware of a danger and either helped create it or made the individual more vulnerable to it. *Kneipp*, 95 F.3d at 1205 (citing *DeShaney*, 489 U.S. at 201).

Subsequent cases in this Circuit have refined this "state-created danger" doctrine. Today, to state a claim for a state-created danger under the Due Process Clause, a plaintiff must plausibly plead four elements: (1) "foreseeable and fairly direct harm," (2) "action marked by a degree of culpability that shocks the conscience;" (3) "a relationship with the state making the plaintiff a foreseeable

victim, rather than a member of the public in general;" and (4) "an affirmative use of state authority in a way that created a danger, or made others more vulnerable than had the state not acted at all." *Johnson v. City of Philadelphia*, 975 F.3d 394, 400 (3d Cir. 2020) (Matey, J.) (cleaned up).

The degree of culpability that "shocks the conscience" is a fact-dependent inquiry that depends on how much time the government agent had to deliberate. *Id.* at 401. In "hyperpressurized environments" that require "snap" judgments, the state actor must intend to cause harm. *Id.* (cleaned up). Where there are "hours or minutes" to decide, the "state actor must disregard a great risk of serious harm." *Id.* (cleaned up). When a state actor has sufficient time to make an "unhurried judgment," the plaintiff need only show a state of mind amounting to "deliberate indifference." *Id.* (cleaned up).

This is the current state of the doctrine in this Circuit, *see id.* at 400, although some members of this Court have expressed reservations. *See*, *e.g.*, *id.* at 404 (Matey, J., concurring) (suggesting the Court "revisit the state-created danger doctrine"); *id.* at 405–06 (Porter, J., concurring); *Kedra*, 876 F.3d at 462 (Fisher, J., concurring).

## III. The Third Circuit's State-Created Danger Doctrine is Consistent With This Nation's History and Tradition of Tort Liability for the Malfeasance or Misfeasance of Government Officials

Judges are naturally hesitant to entertain suits for unenumerated rights absent some clear justification. However, a "state-created danger" cause of action under the Due Process Clause, properly applied and limited, is fully consistent with this nation's longstanding history and tradition. From the beginning of the Republic, extending through the Reconstruction Era to today, Anglo-American common law has recognized a cause of action in tort against government officials who injure others through malfeasance or misfeasance in office.

Although there was no cause of action historically denominated as "state-created danger" *per se*,[1] no such historical twin is required by the Court's due process jurisprudence, *see Loving*, 388 U.S. at 12, any more than the Seventh Amendment's "historical test" limits the jury right only to those causes of action that existed at common law in 1791. *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 122 (2024) ("[T]he right is not limited to the common-law forms of action

---

[1] Because historical causes of action were constrained by the old common-law pleading system, it is nearly impossible to find specific writs called "negligence," "gross negligence," or "recklessness"—all of these theories of liability would likely have been pursued through a writ like "case," "trespass," or "assumpsit." *See* James E. Pfander & Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 N.Y.U. L. Rev. 1862, 1871–72 (2010); Dan B. Dobbs, The Law of Torts § 111 (2000) ("An action on the Case was proper [] when the defendant inflicted injury that was not immediate and direct . . . .")

recognized when the Seventh Amendment was ratified." (cleaned up)); *Galloway v. United States*, 319 U.S. 372, 390 (1943) ("The [Seventh] Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according to the common law in 1791 any more than it tied them to the common-law system of pleading . . . ." (alteration added)).

The notion that there must be some tort remedy for egregious official malfeasance or misfeasance sourced in fundamental law is deeply ingrained in Anglo-American jurisprudence and was the common-law backdrop on which the Fifth and Fourteenth Amendments were written and ratified. Indeed, it was the very *lack* of adequate remedies for African Americans and their Union allies injured by the malfeasance and misfeasance of local officials that motivated passage of the Fourteenth Amendment and the Civil Rights Act of 1871 (present-day 42 U.S.C. §§ 1983, 1985, 1986). This virtually seamless provenance of common-law custom and practice should assuage understandable, but ultimately unwarranted, concern that this Circuit's narrow "state-created danger" doctrine is untethered to any deeply rooted history or tradition of the Due Process Clause.

### A. Tort Liability for Officer Malfeasance and Misfeasance from the Founding Until the Reconstruction Era

The notion that state agents must answer to private parties for their official misconduct goes back to the common-law roots of the American judicial system.

At English common law "[t]here was a wide range of actions for damages against officials." Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 19 (1963). In thirteenth-century England, the King's Court of Exchequer "could at the suit of private individuals discipline the sheriffs and the bailiffs . . . and order them to desist and answer to the individual for their trespasses." *Id.* at 9. During the reign of Edward I, the First Statute of Westminster (1275) specified that a government agent who "by Colour of his Office" wrongly deprived a person of his property interest or any part of it should be liable in an action for double damages. 3 Edw. 1, c. 24*; see also* Jaffe, *supra*, at 9.

William Blackstone spoke of the common law as permitting suits against justices of the peace for "double costs" for "willful and malicious injury" inflicted under color of their office. 1 William Blackstone, Commentaries *354-355 (1793). He elsewhere suggested justices of the peace may be liable "in damages for all the consequences" of error, even when the misconduct lacked an evil intent or corrupt motive. *Id.* at *354 n.17; *see also* David E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1, 4 (1972) ("[T]here was a tradition in England of private relief in damages" for specific officials who "default[ed] in their official duties or exceed[ed] their lawful powers." (alterations added)). This was the immemorial common-law tradition of officer liability that

Stuart Monarchs attempted to disrupt, and which was restored and reaffirmed after the Glorious Revolution. Jaffe, *supra*, at 13 ("The Glorious Revolution confirmed the claims of Parliament, the courts, and the common law . . . reinforcing and extending traditional remedies . . . .").

Courts on this side of the Atlantic "seized this principle of personal official liability" and "applied it with unprecedented vigor." Engdahl, *supra*, at 14. "In the early Republic, 'an array of writs . . . allowed individuals to test the legality of government conduct by filing suit against government officials' for money damages 'payable by the officer.'" *Tanzin v. Tanvir*, 592 U.S. 43, 49 (2020) (quoting James E. Pfander & Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 N.Y.U. L. Rev. 1862, 1871–75 (2010)). And "[t]hese common-law causes of action remained available through the 19th century and into the 20th." *Id.* (citing, *inter alia*, *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804); *Elliott v. Swartwout*, 35 U.S. (10 Pet.) 137 (1836); *Mitchell v. Harmony*, 54 U.S. (13 How.) 115 (1851); *Buck v. Colbath*, 70 U.S. (3 Wall.) 334 (1865)).

Justice Joseph Story, in his influential treatise on agency law, stated that, although the sovereign and certain high executive officials may enjoy a measure of immunity at common law, such immunities did not extend to every executive agent: "[W]here the subordinate officers of the government are guilty of direct

misfeasances or positive wrongs to third persons in the discharge of their official functions . . . they incur the same personal responsibility, and to the same extent, as private agents." Joseph Story, Commentaries on the Law of Agency § 320 (6th ed. 1863) [hereinafter Story (1863)]; *see also* Joseph Story, Commentaries on the Law of Agency § 320 (1st ed. 1839) [hereinafter Story (1839)] (disclaiming any distinction of personal liability between "private agents" or "public agents" for misfeasance). Story offers the example of *Leader v. Moxon* from English common law where "commissioners, appointed to pave certain streets" by Parliament "grossly exceeded their powers" by "raising the street in front of the plaintiff's house" so as to block passage, and were thereby "liable to an action on the case for damages." Story (1839) § 320; *see also Leader v. Moxon*, (1773) 96 Eng. Rep. 546, 547 (C.P.). This doctrine "is founded upon a very plain principle of common sense and common justice . . . that no person shall shelter himself from personal liability, who does a wrong under color of, but without any authority, or by an excess of his authority, or by a negligent use or abuse of his authority." Story (1839) § 320; *accord* Story (1863) § 320. It also flowed from the basic premise that the rule of law requires a remedy for a wrong—the more the principal is immune from liability, the more essential a remedy against the agent. Story (1863) § 319b.

Numerous antebellum cases confirm this tradition. *See Tanzin*, 592 U.S. at 49 (citing cases). In *Little v. Barreme*, the Supreme Court held that a U.S. naval commander who had acted beyond the scope of congressional authorization in seizing a Danish vessel was personally liable in damages to the ship's owner. 6 U.S. (2 Cranch) 170, 178–79 (1804). Similarly, in *Wise v. Withers*, the Court held that an official who had seized an individual's property in excess of his power was liable in trespass. 7 U.S. (3 Cranch) 331, 337 (1806). Later, in *Elliott v. Swartwout*, the Court held that a customs collector could be held personally liable for overcharging duties to a merchant, provided that the merchant had notified the collector at the time of payment that the duties were excessive. 35 U.S. (10 Pet.) 137, 156, 159 (1836). And in *Mitchell v. Harmony*, the Court affirmed a judgment ordering an army officer to pay damages to a merchant whose property he had unlawfully seized during the Mexican-American War. 54 U.S. (13 How.) 115, 133–34, 136 (1851).

While none of these cases were brought under a "state-created danger" or "due process" writ—there was no such thing in the nineteenth century (any more than a "right to keep and bear arms" writ)—they all evince the basic notion that "due process" requires a remedy against arbitrary or outrageous executive behavior. *See* Tymkovich et al., *supra* at 1982 ("[T]he shocks-the-conscience

caselaw remains true to at least one of the earliest interpretations of the phrase 'due process of law': preventing unauthorized deprivations by executive officials.").

### B. Tort Liability for Officer Malfeasance and Misfeasance from Reconstruction Onward

The generation that proposed and ratified the Fourteenth Amendment and its implementing legislation did so cognizant of a "fairly unyielding body of tort law" developed from "common law-norms" that "assess[ed] the liability of government actors for invasions of rights to person and property." James Pfander, Constitutional Torts and the War on Terror 3 (2017) (alteration added). This tradition of officer liability for malfeasance and misfeasance was the common-law foundation upon which the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses were laid.

Reconstruction Congresses repeatedly sought to protect Freedmen and Southern Unionists from atrocities perpetrated by private mobs and paramilitary organizations accepted and encouraged by local law enforcement. In 1866 alone, Freedmen and their allies suffered massacres at the hands of these terrorists in Norfolk, Virginia; Memphis, Tennessee; and New Orleans, Louisiana. *See* George C. Rable, But There Was No Peace: The Role of Violence in the Politics of Reconstruction 31, 33–58 (2007); Kurt T. Lash, *The Origins of the Privileges or Immunities Clause, Part III: Andrew Johnson and the Constitutional Referendum*

*of 1866*, 101 Geo. L.J. 1275, 1307–08 (2013). State and local officials—when they weren't actively participating in the brutality—were often deliberately indifferent to it. *See* Report on Memphis Riots and Massacres, H.R. Rep. No. 39-101, at 5 (1st Sess. 1866). These massacres, and the lack of effective recourse against those officials who enabled them, "starkly illustrated the need to require states to protect the rights of speech, press, assembly, and due process." Lash, *supra* at 1307.

Floor debates on the Fourteenth Amendment and contemporaneous legislation came amidst impassioned calls for the nation to protect the rights of United States citizens "against state-directed (or consciously permitted) violence." *Id.* at 1313. Advocates for the proposed Fourteenth Amendment highlighted the fact that Southern governments were consciously disregarding the safety of Freedmen and Unionists. A convention of "Loyal Southerners" demanded "protection to every citizen of the great Republic on the basis of equality before the law." *Id.* at 1309 (quoting *The Southern Loyalists' Convention*, Trib. Tracts No. 2, July 10, 1866, at 1 (internal quotation marks omitted)). A circular signed by three prominent loyal southerners, including a future Reconstruction congressman, decried those southerners who sought readmission "in one breath, and, in the next, excite[d] a brutalized mob to violence upon a citizen." *Id.* at 1310 (quoting *Circular Letter, signed by A.J. Hamilton, M.J. Saffold & Wm. B. Stokes*, Trib. Tracts No. 2, July 10, 1866, at 3–4 (alteration added) (internal quotation marks

omitted)). A contemporaneous newspaper editorial stated that the first section of the proposed Fourteenth Amendment would "make lawful liberty, the security of life, person and property, a reality and not a mere sham." *Id.* at 1322 (quoting *Secretary Browning's Letter*, Evening Post, Oct. 24, 1866, at 2 (N.Y.C) (internal quotation marks omitted)). Conventions of African Americans frequently highlighted the lack of protection from violence in their appeals to the federal government. David H. Gans, *Forgotten Framers: Black Conventions and the Second Founding*, 79 Stan. L. Rev. ____ (forthcoming 2027) (manuscript at 8), https://ssrn.com/abstract=6292939 ("Time and again, Reconstruction-era Black Conventions stressed . . . protection of the laws, including protection from violence and other legal wrongs . . . .").

Contemporaneous debates over the Civil Rights Act of 1866 and the Freedmen's Bureau Bill show that the Framers believed that fundamental natural rights and due process required government to ensure a remedy in the face of state-enabled misfeasance or malfeasance. Representative William Lawrence observed the "two ways in which a State may undertake to deprive citizens of the[ir] . . . rights: either by prohibitory laws, or by a *failure to protect any one of them*." Cong. Globe, 39th Cong., 1st Sess. 1833 (1866) (alteration added) (emphasis added). Lawrence continued, if a state denies "all protection by *civil process* or penal enactments, that would be a denial of justice." *Id.* (emphasis added).

Senator Lyman Trumbull traced the concept back to the bedrock exchange of a man's natural liberty for "the protection which civil government gives him." Cong. Globe, 39th Cong., 1st Sess. 474 (1866). An official report on the Memphis massacre, issued roughly contemporaneously with the drafting of the Fourteenth Amendment, documented how local law enforcement had not only refused to protect Black citizens, but had actively inflamed the murderous work of the mob. *See* Report on Memphis Riots and Massacres, H.R. Rep. No. 39-101, at 34 (1866) (1st Sess.).

In 1868, the same year that the nation ratified the Fourteenth Amendment, Thomas Cooley published in his *Treatise on Constitutional Limitations* that the principles of "due process" and "the law of the land" as used in American jurisprudence could all be traced to the basic principle, founded in Magna Carta, of "[t]he protection of the subject in the free enjoyment of his life, his liberty, and his property." Thomas M. Cooley, A Treatise on Constitutional Limitations 351–53 (1st ed. 1868). And within the decade, in his fourth edition of *Limitations*, Cooley would confirm that the law of the land means that "every man is entitled to a certain remedy in the law for all wrongs against his person or his property." Thomas M. Cooley, A Treatise on Constitutional Limitations 449–450 (4th ed. 1878).

When members of the Forty-Second Congress deliberated on the Civil Rights Act of 1871—officially titled "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes"—they highlighted the fact that state officials were shockingly unconcerned with private Klan violence visited upon African American citizens and their allies.

Supporters in Congress traced the principles of the Civil Rights Act of 1871 to "the very earliest written constitution of civilized liberty"— Magna Carta. Cong. Globe, 42d Cong., 1st Sess. 697 (1871) (statement of Sen. Edmunds). These were principles "blazed on the forehead of constitutional liberty." *Id.* They included that executive officers must "afford protection against all forms of wrong and oppression." *Id.* Hence, denial of "due redress" was not merely to refuse to pass legislation, but to refuse to provide "security to the citizen that he shall have the protection of law." *Id.* The Act's supporters noted that officers and institutions of Southern governments had defaulted on these duties, surrendering Freedmen and Unionists to extra-legal violence that "execut[ed] its purposes with a certainty . . . more terrible than ever attended due process of law." *Id*. at 333 (Statement of Rep. Hoar) (alteration added); *see also id.* at 374 (Statement of Rep. Lowe) ("[M]urder is stalking abroad in disguise" while "local administrations" are "inadequate or unwilling" to provide safety). Allowing only "certain persons" to have "their

property, safety, liberty or life" violated at the hands of lawless individuals without redress was as much a denial of fundamental rights as passing legislation to curtail fundamental rights. *Id.* at 459 (statement of Rep. Coburn). Overlooking these rights' violations was a repudiation of the basic agreement of the social contract—that in exchange for protection of the government, the citizen offers allegiance. *See* Pamela Brandwein, Rethinking the Judicial Settlement of Reconstruction 29 (2011); *see also* Cong. Globe, 39th Cong., 1st Sess. 1757 (1866) (statement of Sen. Trumbull) ("Allegiance and protection are reciprocal rights.").

Section six of the Civil Rights Act of 1871 illustrates how the Framers of Reconstruction understood the Fourteenth Amendment and its enforcement legislation to conform to deeply rooted traditions of official liability for malfeasance or misfeasance in office. It provides "[t]hat any person or persons, having knowledge" of a conspiracy to deprive a person of the equal protection of the laws or due process "and having power to prevent or aid in preventing the same," is "liable to the person injured" if that person or persons "neglect[s] or refuse[s] to" prevent the conspiracy, and the conspiracy's "wrongful act shall be committed." Civil Rights Act of 1871, ch. 22, § 6, 17 Stat. 15 (codified as amended at 42 U.S.C. § 1986) (alterations added).

To enforce the rights of the Fourteenth Amendment, Congress specified in section six that damages could be recovered "in an action on the case" in federal

court. *Id.* The use of the term "action on the case" is significant, because "case" in the ancient common-law pleading system meant a cause of action for indirect harms or harms caused by misfeasance of individuals. *See* Dan B. Dobbs, The Law of Torts § 111 (2000); *see also Storrs v. Wetmore*, 1 Kirby 203, 203 (Conn. Super. Ct. 1787) ("This was an action on the case . . . for the misfeasance of the navigator.").

Section six was not a novelty. It was simply a statutory confirmation of the long-settled common-law notion that fundamental notions of due process required some remedy for outrageous official behavior that causes harm to others—whether intentional or not. *See, e.g.*, *Erwin v. Davenport*, 56 Tenn. (9 Heisk.) 44, 48 (1871) ("Where the subordinate officers of the Government are guilty of direct misfeasances or positive wrongs to third persons in the discharge of their official functions, they incur the same personal responsibility, and to the same extent, as private agents." (citing Story, §320)); *Wright v. Shanahan*, 44 N.E. 74, 75 (N.Y. 1896) ("It is . . . the settled law of the state that the negligent omission of a public officer to perform a ministerial duty, or an improper discharge thereof, renders him liable . . . to respond in damages to the injured party.").

### C. The History and Tradition of Due Process Supports a Narrow Cause of Action for State-Created Dangers

This history and tradition of Due Process support a narrowly drawn theory of liability for state-created danger as articulated in *Kneipp* and its progeny. Granted, deeply rooted history and tradition do *not* require an open-ended and general right to protection, to be claimed by the public at large, as the Supreme Court and this Court have recognized. *See DeShaney*, 489 U.S. at 196, 200. Nor do history and tradition support a cause of action for simple failure to perform a discretionary function absent some evidence of a conscience-shocking state of mind. *See, e.g.*, *Ladd v. Newell*, 24 N.W. 366, 368 (Minn. 1885) (stating that an officer becomes liable when "there has been a substantial violation of the legal rights of the [injured] party, and of such a character as to show a gross or wanton disregard of duty on [the officer's] part" (alterations added)); *Paul v. Slason*, 22 Vt. 231, 236 (1850) (stating that the "early doctrine of the common law, that when a party was guilty of abuse of authority given by the law" only extends to cases where there is some "clear, substantial violation of the plaintiff's rights, and of such a character as to show a wanton disregard of duty"). Finally, officials alleged to be liable for creating a conscience-shocking "state-created danger" under the Due Process Clause are still entitled to raise a qualified immunity defense for such a cause of action. *Sauers v. Borough of Nesquehoning,* 905 F.3d 711, 723 (3d Cir. 2018) (awarding qualified immunity in a state created danger case); *cf. Eddy v. V.I.*

*Water & Power Auth.*, 256 F.3d 204, 212–13 (3d Cir. 2001) (Alito, J.) (recognizing a "shocks the conscience" cause of action for government employer misfeasance and a qualified immunity defense to the same).

But where a harm is foreseeable and fairly direct, the malfeasance or misfeasance of the official is conscience-shocking, the individual or group harmed by that malfeasance or misfeasance is foreseeable and specific, and the malfeasance or misfeasance results from affirmative use of state authority that either creates the danger or makes others more vulnerable to it, then the long, deeply rooted history and tradition of this nation support a due process right that can be vindicated through a Section 1983 cause of action.

## CONCLUSION

For these reasons, this Court should conclude that the Due Process Clause does recognize a narrow cause of action for "state-created danger" and remand the case for further proceedings.

Respectfully submitted,

/s/ Darrell A.H. Miller

Ohio No. 0075950
Admitted *Pro Hac Vice*
1111 East 60th Street
Chicago, Illinois 60637
(773) 702-9494

*Attorney for Amicus Curiae*

## CERTIFICATION OF ADMISSION TO BAR

I, Darrell A.H. Miller, certify as follows:

1. I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit, having been admitted *pro hac vice* for appeal No. 25-2592 effective June 24, 2026.

2. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: October 1, 2026

*/s/* Darrell A.H. Miller
1111 East 60th Street
Chicago, Illinois 60637
(773) 702-9494
*Attorney for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 4,846 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

*/s/* Darrell A.H. Miller
Darrell A.H. Miller

## CERTIFICATE OF FILING AND SERVICE

I certify that on this 1st day of October 2026, the foregoing Brief was filed via CM/ECF and served on all parties or their counsel of record via the CM/ECF system.

Respectfully submitted,

Dated: October 1, 2026

By: /s/ Darrell A.H. Miller

1111 East 60th Street
Chicago, Illinois 60637
(773) 702-9494
*Attorney for Amicus Curiae*